IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA SABOL | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FORD MOTOR COMPANY | : | NO. 14-6654 |

MEMORANDUM

Bartle, J.                                                    July 16, 2015

Plaintiff Patricia Sabol ("Sabol"), on behalf of herself
and all others similarly situated, has sued Ford Motor Company
("Ford") for:  breach of express and implied warranty; unjust
enrichment; violations of the Magnuson-Moss Warranty Act ("MMWA"),
15 U.S.C. § 2301 et seq.; and violations of Pennsylvania's Unfair
Trade Practices and Consumer Protection Law ("PUTPCPL"), 73 Pa.
Cons. Stat. Ann. § 201-1 et seq.  Her individual claims relate to
an alleged defect in a vehicle she purchased from a Ford dealership
in 2012.  Sabol has not yet moved for class certification.

Now before the court is the motion of Ford for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure.

I.

Summary judgment is appropriate "if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323

(1986).[1]

  A dispute is genuine if the evidence is such that a

reasonable factfinder could return a verdict for the nonmoving

party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 254 (1986).

Summary judgment is granted where there is insufficient record

evidence for a reasonable factfinder to find for the plaintiffs.

<u>Id.</u> at 252.  "The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there

must be evidence on which the factfinder could reasonably find for

the plaintiff."  <u>Anderson</u>, 477 U.S. at 252.

  When ruling on a motion for summary judgment, we may

only rely on admissible evidence.  <u>See, e.g.</u>, <u>Blackburn v. United</u>

<u>Parcel Serv., Inc.</u>, 179 F.3d 81, 95 (3d Cir. 1999).  We view the

---

3.  Rule 56(c) states:

>A party asserting that a fact cannot be or is
>genuinely disputed must support the assertion
>by ... citing to particular parts of materials
>in the record, including depositions,
>documents, electronically stored information,
>affidavits or declarations, stipulations ...,
>admissions, interrogatory answers, or other
>materials; or ... showing that the materials
>cited do not establish the absence or presence
>of a genuine dispute, or that an adverse party
>cannot produce admissible evidence to support
>the fact.

Fed. R. Civ. P. 56(c).

facts and draw all inferences in favor of the nonmoving party.  In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

II.

The following facts are undisputed or viewed in the light most favorable to Sabol as the nonmovant.  In October 2012, Sabol purchased a 2013 Ford Escape from Garnet Ford, a dealership in Chadds Ford, Pennsylvania.  She based her decision to do so in part on advertisements she had seen on television presenting the vehicle as safe, reliable, and fuel efficient.  The vehicle, which was manufactured by defendant Ford, employed the company's "EcoBoost" engine technology.

At the time she purchased the vehicle, Sabol also received Ford's written New Vehicle Limited Warranty (the "Limited Warranty").  That Limited Warranty guaranteed that as long as a purchaser properly operated and maintained her vehicle "authorized Ford Motor Company Dealers will, without charge, repair, replace, or adjust all parts on [the] vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory

workmanship."[2]  The Limited Warranty cautioned, however, that
"[t]his warranty does not mean that each Ford vehicle is defect
free."  Accordingly, it expressly provided that "Ford and its
authorized dealers are entitled to a reasonable time and a
reasonable number of attempts within which to diagnose and repair
any defect covered by" the Limited Warranty.

          On July 10, 2013, just under nine months after Sabol
purchased her vehicle, Ford issued to its dealers a Technical
Service Bulletin ("TSB") regarding a potential defect in 2013 Ford
Escape vehicles.  The TSB advised dealers that a defect in EcoBoost
engines could cause vehicles to shake, lose power, become
temporarily incapable of accelerating above certain low speeds, or
even shut down completely while in motion.  The TSB also suggested
a repair for the problem.

          In late July 2013, Sabol was driving to work when her
vehicle stalled.  In her deposition, she recalled that "[t]he
engine fault light came on and the car just stopped accelerating.
It just stalled....  [T]he gas pedal was not working."
Fortunately, Sabol was able to pull over onto the shoulder.  When
she restarted her vehicle, it appeared to operate normally.  Sabol
continued her commute, but moments before she arrived at work the
vehicle stalled once again.  However, she was able to restart it.

---

2.  Ford does not appear to dispute that the alleged failures
occurred "during the applicable coverage period."

Within a day, Sabol took her car to Garnet Ford for repair.  The dealership, unable to replicate the problem, initially informed Sabol that it could not fix the vehicle.  Sabol contacted a Ford Customer Care representative who in turn reached out to Garnet Ford, which ultimately agreed to attempt the repair described in the TSB of July 10, 2013.  Sabol was reimbursed for a rental car while the repair was being made.

Between September 2013 and February 2014, Ford issued four additional TSB's to its dealers.  The first two, issued in September 2013, again described problems with the EcoBoost engine, but applied to vehicle models other than the Ford Escape.  A third TSB, issued in November 2013, superseded the July 10, 2013 TSB and advised a different repair.  It also expanded the class of vehicles to which the July 2013 TSB had applied to include 2014 Ford Escapes.  On February 20, 2014, Ford issued a TSB which superseded one of the September 2013 TSB's and once again expanded the list of impacted vehicles.  According to plaintiff, no vehicle owners were informed of any of the relevant TSB's.

Sabol experienced no further problems with her car until the following year.  On or about February 20, 2014, when Sabol attempted to put it into drive mode after backing out of her driveway, the "engine fault light came on and the car would not let [Sabol] accelerate over 10 miles an hour."  According to Sabol, the engine also shook and "stuttered."  When she restarted her vehicle,

-5-

she experienced the same problem.  She returned it to her driveway and the next day drove it to Garnet Ford without incident.  Sabol also contacted a Ford Customer Care representative.

Once again, Garnet Ford initially refused to attempt a repair on the ground that it could not replicate the problem.  At the request of the Customer Care representative with whom Sabol had spoken, Garnet Ford eventually called Ford's technical hotline for guidance.  During that call, Garnet Ford received detailed advice, but remained unable to remedy the malfunction.  Meanwhile, on February 24, the representative contacted Sabol again.  She explained to Sabol that since the dealership was unable to replicate the problem, and since no computer codes indicated which system was creating the issue, it would be difficult for the dealership to proceed.  The representative offered Sabol a Premium Extended Service Plan and promised to follow up within a week.

When she did follow up on February 27, the representative spoke with Sabol's father.  The details of their conversation are disputed.  Ford maintains that the representative offered to help Sabol obtain a second opinion, while Sabol relies on her father's recollection that the representative recommended obtaining a second opinion only if the problem recurred.  The representative followed up a second time in early March and was informed by Sabol's father that he would seek a second opinion only if the difficulty with the vehicle arose again.  Sabol's father

-6-

told the representative that it was not necessary for her to follow up again.  No repair was ever implemented in response to the February 2014 failure of the vehicle.

Between February and early June 2014, Sabol experienced no further problems with her car.  She filed the instant action on June 9, 2014.  The next day, the problem manifested itself again: the vehicle "was again not allowing [her] to go over 10 miles per hour, was stalling, was shaking."  This time, Sabol took her car to a different dealership, Springfield Ford Lincoln.  That dealership quickly identified what it believed to be the problem:  faulty splices in the vehicle's signal return.  The dealership implemented the repair described in the November 2013 TSB, and since that time Sabol has experienced no further difficulties with her vehicle. She stated in her March 2015 deposition that she feels it is safe to drive.

III.

We turn first to Sabol's allegations that Ford breached its express and implied warranties.  Sabol's second count in the complaint pleads a breach of two express warranties:  the express warranty purportedly created by Ford's advertising of the vehicle as "safe" and "reliable," and the written Limited Warranty provided

-7-

to Sabol at the time of sale.  The third count pleads a breach of the implied warranty of merchantability.[3]

Sabol alleges that Ford's express warranties were breached by the existence of the purported defect and by Ford's initial failure to remedy it.  In support of its motion for summary judgment, Ford first maintains that the statements contained in its advertisements constituted non-actionable "puffing."  Ford cites a Pennsylvania Supreme Court decision which considered claims arising from the death of a pilot in a helicopter crash.  Berkebile v. Brantly Helicopter Corp., 337 A.2d 893 (Pa. 1975), abrogated on other grounds, Reott v. Asia Trend, Inc., 55 A.3d 1088 (Pa. 2012).  The pilot's widow had sued the helicopter manufacturer.  Id. at 897.  She contended that statements contained in the company's brochure characterizing the helicopter as "safe" and "dependable" amounted to misrepresentations under the Restatement (Second) of Torts.  See id. at 903.  The Pennsylvania Supreme Court disagreed.  See id.  It explained that a "[m]isrepresentation must be distinguished from mere 'puffing.'"  Id.  Federal district courts, including those in Pennsylvania, have applied this logic in the context of actions for breach of warranty.  See, e.g., In re Ford

---

3.  We defer until § IV of this opinion our discussion of the first count in Sabol's complaint, that is, her claim that Ford acted in violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.  We do so because the existence of a claim under that statute hinges on the existence of a valid state-law breach-of-warranty claim.  See, e.g., Walsh v. Ford Motor Co., 807 F.2d 1000, 1013 (D.C. Cir. 1986).

Motor Co. E-350 Van Prods. Liab. Litig. (No. II), 2010 WL 2813788, at *40 (D.N.J. July 9, 2010); Cnty. of Mercer v. UniLect Corp., 612 F. Supp. 2d 638, 650 (W.D. Pa. 2009); Hubbard v. Gen. Motors Corp., 1996 WL 274018, at *6-*7 (S.D.N.Y. May 22, 1996); accord Forbis v. Reilly, 684 F. Supp. 1317, 1320-21 (W.D. Pa. 1988). In response to Ford's reliance on Berkebile, Sabol urges that claims which are subject to measurement do not constitute puffery. Here she argues that "[w]hether the EcoBoost engine is superior to other vehicle options is measurable by comparison." This, however, is not what the advertisements said.

The advertising statements identified by Sabol – that the vehicle she ultimately purchased was "safe" and "reliable"[4] – are not measurable and amount to puffery. See Berkebile, 337 A.2d at 903-04. These statements are simply subjective opinions and do not give rise to liability for breach of express warranty. See, e.g., Morris Aviation, LLC v. Diamond Aircraft Indus., Inc., 536 F. App'x 558, 563 (6th Cir. 2013); In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II), 2008 WL 4126264, at *3 (D.N.J. Sept. 2, 2008). We will therefore grant the motion of Ford for summary judgment on Sabol's express warranty claim premised on the advertising statements she identifies.

---

4.  Sabol also claims to have relied on advertising statements that the vehicle was fuel-efficient.  She does not appear to base her breach of express warranty claim on this representation of fuel efficiency.

As to Sabol's claim that Ford breached the express warranty created by its written Limited Warranty, there remain genuine disputes of material fact.  See Fed. R. Civ. P. 56(a).  As noted above, that Limited Warranty ensured that authorized Ford dealers would conduct repairs free of charge to malfunctioning vehicles which had been properly operated and maintained.  It cautioned, however, that Ford and its dealers were "entitled to a reasonable time and a reasonable number of attempts within which" to implement such repairs.  Ford provides citations in support of the proposition that the law provides it with some leeway in making repairs before it can be held liable for breach of warranty.  None of the Pennsylvania cases cited, however, granted summary judgment in favor of the manufacturer under scenarios analogous to this one. See Woolums v. Nat'l RV, 530 F. Supp. 2d 691, 699 (M.D. Pa. 2008); Ruffin v. Fleetwood Motor Homes of Pa., Inc., 1997 WL 752000, at *4-*10 (E.D. Pa. Dec. 4, 1997); Price v. Chevrolet Motor Div. of Gen. Motors Corp., 765 A.2d 800, 810 (Pa. Super. Ct. 2000).  We cannot say as a matter of law, taking the evidence in the light most favorable to Sabol, that summary judgment should be granted in favor of Ford on this claim.  The same is true of Sabol's claim that Ford breached its implied warranty of merchantability, with respect to which there remain genuine disputes of material fact. They present issues for the jury to decide.  Accordingly, we will deny Ford's motion for summary judgment on Sabol's claim insofar as

it is predicated on Ford's Limited Warranty.  For the same reasons
we will also deny Ford's motion concerning Sabol's claim alleging a
breach of Ford's implied warranty.

IV.

Having addressed Sabol's state-law claims for breach of
express and implied warranty, we may now consider her first claim,
which pleads liability under the MMWA.  That statute permits
consumers to bring civil actions in federal court "under a written
warranty, implied warranty, or service contract."  15 U.S.C.
§ 2310(d).  It was enacted in part to "create additional remedies
for breach of warranty, ... to allow for the *possibility* of class
actions in federal court ... [and] to provide minimum disclosure
and content standards particularly for written warranties."  Walsh,
807 F.2d at 1006-07 (emphasis in original).  The MMWA thus
"supplement[s] state warranty law by prescribing certain minimum
standards for warrantors, and by affording consumers additional
avenues for redress."  Id. at 1012.  It does not create new federal
law, but instead calls for the application of state warranty law.
Id. at 1013; see also Johansson v. Central Garden & Pet Co., 804 F.
Supp. 2d 257, 265 (D.N.J. 2011).  Thus, the MMWA does not preempt
state law.  E.g., Gentek Bldg. Prods., Inc. v. Sherwin-Williams
Co., 491 F.3d 320, 328-29 (6th Cir. 2007).

We note that Ford has provided no authority or analysis
in support of its request that we grant summary judgment in its

favor on Sabol's claim under the MMWA.  However, because the MMWA
involves application of state warranty law and does not provide an
independent cause of action, we cannot permit Sabol's MMWA claims
to proceed to the extent that we have granted summary judgment on
the underlying state-law warranty claims.  See, e.g., Clemens v.
DaimlerChrysler Corp., 534 F.3d 1017, 1022 (9th Cir. 2008).  Ford
is accordingly entitled to summary judgment on Sabol's MMWA claim
to the extent that it alleges a breach of the express warranty
purportedly created by Ford's advertising.  See supra § III.
However, because the MMWA claim requires us to apply state warranty
law, and in light of Ford's failure to provide any analysis to the
contrary, we will deny summary judgment on Sabol's MMWA claim
insofar as that claim is premised on (a) any breach by Ford of its
written Limited Warranty and (b) any breach by Ford of the implied
warranty of merchantability.

V.

We next address Ford's motion for summary judgment on
Sabol's unjust enrichment claim.  Ford argues that under
Pennsylvania law "the doctrine of unjust enrichment is inapplicable
when the relationship between the parties is founded upon a written
agreement or express contract."  See Wilson Area Sch. Dist. v.
Skepton, 895 A.2d 1250, 1254 (Pa. 2006).  Because the relationship
between the parties is founded upon a contract, Ford contends,
Sabol's unjust enrichment claim must fail.  Sabol responds by

-12-

calling into question the validity of the contract between the parties.  She argues that the Limited Warranty has "failed its essential purpose."  Ford counters that Sabol's claim for breach of warranty necessarily presumes the validity of the contract.  Ford notes that if indeed the Limited Warranty failed of its essential purpose, Sabol would be entitled to contract damages.

Ford has the better of the argument.  The foundation of Sabol's case rests on the existence of a valid contract.  We are unpersuaded by Sabol's position that genuine disputes of material fact exist as to the validity of the agreement between the parties. We will therefore grant Ford's motion for summary judgment on Sabol's unjust enrichment claim.

VI.

Finally, we turn to Sabol's claim that Ford has violated the PUTPCPL.  Sabol pleads specifically that Ford's conduct amounted to "unfair methods of competition or unfair or deceptive acts or practices in violation of §§201-2(4)(v), (vii), (xiv), and (xxi)" of the statute.[5]  Sabol states in her complaint that Ford

---

5.  Section 201-2 of the PUTPCPL is the "definitions" section of the statute.  It states in relevant part:

> (4)  "Unfair methods of competition and "unfair or deceptive acts or practices" mean any one or more of the following:
>
> ...

violated the PUTPCPL by making affirmative misrepresentations about the vehicle and its EcoBoost engine, neglecting to disclose material information about the vehicle and engine, and failing to comply with the terms of its Limited Warranty.

Though Sabol claims to have relied on affirmative misrepresentations made by Ford about the quality of the vehicle, the only specific statements she identifies are the representations made in Ford's advertisements that the 2013 Escape was "safe" and "reliable."  As we have already determined, these statements amount to "puffing" and do not provide any basis for a valid claim for

_____

> (v)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have ... ;
>
> ...
>
> (vii)  Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
>
> ...
>
> (xiv)  Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made; [and]
>
> ...
>
> (xxi)  Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

73 Pa. Cons. Stat. Ann. § 201-2.

-14-

relief.  See supra § III.  For this reason, and because Sabol
identifies no purported misrepresentations aside from the
advertising statements, we will grant Ford's motion for summary
judgment on Sabol's PUTPCPL claim insofar as that claim is premised
on "affirmative misrepresentations."

Sabol also bases her PUTPCPL claim on Ford's alleged
failure to comply with the written Limited Warranty.  As discussed
above, genuine disputes of material fact remain as to whether Ford
complied with that warranty.  See supra § III.  In this regard we
will deny Ford's motion for summary judgment on Sabol's PUTPCPL
claim.

We are left with Sabol's assertion that Ford ran afoul
of the PUTPCPL by engaging in fraudulent concealment.  Ford urges
that it is entitled to summary judgment on this claim in light of
our Court of Appeals decision in Werwinski v. Ford Motor Co., 286
F.3d 661 (3d Cir. 2002).  In Werwinski, the court considered the
claims of vehicle purchasers that Ford Motor Company had violated
the PUTPCPL by fraudulently concealing certain known defects in the
vehicles.  Id. at 664.  Due to these defects, the purchasers had
incurred significant repair costs, though no physical injuries were
alleged.  Id.  Ford Motor Company urged that the purchasers' claims
of fraudulent concealment under the PUTPCPL were barred by the
economic loss doctrine, which "prohibits plaintiffs from recovering
in tort economic losses to which their entitlement flows only from

-15-

a contract." Id. at 671 (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995)). This doctrine is premised in part on the rationale that "relying on contract law permits parties to negotiate the terms of the manufacturer's liability." See id. (internal citations omitted). While the Pennsylvania Supreme Court had not weighed in on this specific question, our Court of Appeals, after thoroughly analyzing the decisions of Pennsylvania state courts and other federal district courts, predicted that the Commonwealth's high court would apply the economic loss doctrine to preclude recovery for fraudulent concealment under the PUTPCPL. Id. at 681.

        Sabol urges that Werwinski should not control our analysis. She directs our attention to a 2015 district court decision which declared that "Werwinski no longer has any vitality." See Kantor v. Hiko Energy, LLC, --- F. Supp. 3d ---, 2015 WL 1650049, at *3 (E.D. Pa. Apr. 14, 2015). That decision, in turn, relied on the 2013 holding of the Pennsylvania Superior Court in Knight v. Springfield Hyndai, 81 A.3d 940 (Pa. Super. Ct. 2013), which articulated a conclusion arguably contrary to that reached by the Werwinski court.

        We do not agree with Sabol's contention that Werwinski no longer binds us. In the absence of contrary authority from the Court of Appeals or the Pennsylvania Supreme Court, we are bound by the decisions of our Court of Appeals, even if superseding

-16-

decisions of lower-level state courts call into question those appellate rulings.  See, e.g., Weber v. GAF Corp., 15 F.3d 35, 37 (3d Cir. 1994); Rutherford v. Columbia Gas, 575 F.3d 616, 619 (6th Cir. 2009); Reiser v. Residential Funding Corp., 380 F.3d 1027, 1029 (7th Cir. 2004).  Absent a ruling from the state's highest court, "decisions of intermediate state courts ... are just prognostications.  They could in principle persuade [a federal appellate court] to reconsider and overrule [its] precedent; assuredly they do not themselves liberate district judges from the force" of the decisions of federal courts of appeal.  Reiser, 380 F.3d at 1029.

Sabol further urges that even if Werwinski retains force, it has no bearing on her PUTPCPL claims because those claims are "separate and distinct" from her contract-based claims for breach of warranty.  She urges that her statutory claims are "predicated on Ford's misrepresentations and omissions before [she] entered into the contract, and are wholly unrelated to the terms of the contract."  It appears to be Sabol's position that because her PUTPCPL claims do not sound in contract, the reasoning of the Werwinski court is inapposite.  This argument lacks merit.  As Ford correctly observes, the Werwinski court clearly stated that fraudulent concealment claims are "'intertwined' with, and not 'extraneous' to, breach of warranty claims" when those fraudulent concealment claims "relate to 'the quality or character of the

-17-

goods sold.'"  286 F.3d at 678 (quoting <u>Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.</u>, 532 N.W.2d 541, 545 (Mich. Ct. App. 1995)).  Sabol's claim of fraudulent concealment "relate[s] to the quality or character of" her vehicle and is therefore "intertwined" with her contract-based claims.  <u>See</u> <u>id.</u> (internal citation omitted).  <u>Werwinski</u> therefore mandates that this fraudulent concealment claim is barred by the doctrine of economic loss.